UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

AMERICAN CENTER FOR LAW AND
JUSTICE,

Plaintiff,

v.

FEDERAL BUREAU OF INVESTIGATION,

Defendant.

Civil Action No. 22-cv-3711 (SLS)

## DECLARATION OF AMIE MARIE NAPIER

I, Amie Marie Napier, declare as follows:

1.      I am the Section Chief of the Record/Information Dissemination Section (RIDS), Information Management Division, Federal Bureau of Investigation (FBI), located in Winchester, Virginia. I joined the FBI in April 2009, and prior to my current position, I was the Unit Chief of the Office of Internal Auditing's National Security Unit from July 2024 until September 2025; a Unit Chief, Acting Assistant Section Chief, and Acting Section Chief in the Information Technology Infrastructure Division from February 2020 to July 2024; an Auditor, Unit Chief, Assistant Section Chief, and Acting Section Chief in the Training Division from July 2012 to February 2020; an Auditor and Division Compliance Officer in the Security Division from September 2010 to July 2012; and an Auditor and Compliance Team Lead in the Threat Screening Center from April 2009 to September 2010. Prior to joining the FBI, I served as an Auditor with the Department of Defense's Office of Inspector General from September 2003 to April 2009.

2.      In my official capacity as Section Chief of RIDS, I supervise approximately 208 FBI employees, supported by approximately 94 contractors, who staff a total of eight Federal Bureau of Investigation Headquarters units and two field operational service center units. RIDS collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, as amended by the OPEN Government Act of 2007, the OPEN FOIA Act of 2009, and the FOIA Improvement Act of 2016; the Privacy Act of 1974, 5 U.S.C. § 552a; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. The statements contained in this declaration are based upon my personal knowledge, including information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

3.      Because of the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA and the Privacy Act of 1974. Specifically, I am familiar with the FBI's handling of Plaintiff's FOIA request that is the subject of this litigation.

4.      In response to Plaintiff's request, the FBI processed a total of 1,173 pages of responsive records subject to the FOIA. In a Joint Status Report (JSR) filed on July 29, 2025 (ECF No. 26), the parties advised the Court of the three broad categories of issues to which Plaintiff narrowed its objections.[1] In its July 30, 2025, Minute Order, the Court ordered the FBI

---

[1] Per the JSR, Plaintiff's narrowed objections consist of withholdings under the deliberative process privilege as incorporated within FOIA Exemption 5, potential withholdings of individuals' identities under FOIA Exemptions 6 and 7(C), and withholdings of techniques, procedures, and guidelines for law enforcement investigations under Exemption 7(E).

2

to produce a draft Vaughn index to the Plaintiff, the Parties to meet and confer, and the Plaintiff to identify summary judgment challenges. On November 17, 2025, the FBI, via DOJ Counsel, provided Plaintiff a draft Vaughn index. On January 8, 2026, Plaintiff returned the draft *Vaughn* index disputing certain withholdings in 120 pages of records. These are the narrowed issues that the FBI is defending in its summary judgment briefing. Any pages not identified, or exemptions not challenged on a page with other exemptions challenged, are not mentioned or defended herein as Plaintiff is affirmatively not challenging those pages or withholdings. Plaintiff additionally decided to not challenge the FBI's search. Not every withholding on each page was challenged, only certain withholdings on each page. Of these pages, the FBI released 118 pages in part and withheld 2 pages in full pursuant to one or more applicable FOIA Exemptions.[2]

5.      The FBI submits this declaration in support of Defendant's Motion for Summary Judgment. Part I of this declaration provides the Court with a summary of the administrative history of Plaintiff's request; Part II, in accordance with *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), provides the FBI's justification for withholding information in part or in full pursuant to FOIA Exemptions 5, 6, 7(C), and 7(E), 5 U.S.C. § 552(b)(5), (b)(6), (b)(7)(C), and (b)(7)(E).

## PART I: ADMINISTRATIVE HISTORY OF PLAINTIFF'S REQUEST

### FBI REQUEST NUMBER 1560664-000

6.      By letter dated August 31, 2022, Plaintiff submitted a FOIA request to the FBI that contained ten subparts. Plaintiff summarized their overall request as seeking "records

---

[2] Specifically, Plaintiff is challenging either one or more of the following exemption categories on specific Bates pages: (b)(5)-1, (b)(6)-3,-4,-5, (b)(7)(C)-3,-4,-5, and (b)(7)(E)-3,-4,-5,-14, on Bates pages 1, 5, 66, 94, 96-97, 124, 126-127, 129-130, 183-190, 194-199, 202-204, 206-208, 210-213, 239, 243, 249, 257, 260, 291-292, 294-295 326-331, 391, 419, 422, 495-504, 509, 516, 527-529, 531, 540-541, 562-563, 570-573, 576, 581-582, 606-607, 628-631, 637-640, 660-665, 740, 744-745, 757, 762, 774, 794, 802, 842, 844-845, 856-858, 881-882, 897-899, 945, 949, 1033, 1035, 1038-1039, 1103, and 1169.

pertaining to the Federal Bureau of Investigation's (FBI) interactions with and requests to social media and news platforms, including Facebook, to censor or 'be on high alert for' information in connection with the then-upcoming election, which according to Facebook's Mark Zuckerberg, resulted in censorship (or reduced 'distribution' which was 'meaningful') of information, including the Hunter Biden-related stories, on Facebook." (ECF No.1) Plaintiff limited the request for records from January 1, 2020, through date of processing. In addition, Plaintiff requested expedited processing and a waiver of both search and duplication fees associated with the processing of its request. (Ex. A.)

7.      By letter dated September 21, 2022, the FBI acknowledged receipt of Plaintiff's FOIA request and advised Plaintiff that its request was assigned FOIPA Request Number 1560664-000. The FBI also informed Plaintiff of the following: Plaintiff's public interest fee waiver[3] was under consideration, and Plaintiff would be advised of the decision at a later date, and if Plaintiff's fee waiver was not granted, Plaintiff would be responsible for applicable fees; and for the purpose of assessing any fees, the FBI determined as a general (all others) requester, Plaintiff would be charged applicable duplication fees in accordance with 5 U.S.C. § 552(a)(4)(A)(ii)(III). Additionally, the FBI informed Plaintiff it could check the status of its request and/or contact the FBI with any questions at www.fbi.gov/foia. Furthermore, the FBI advised Plaintiff that if it was dissatisfied with the FBI's response, it could appeal the FBI's response to the Department of Justice (DOJ), Office of Information Policy (OIP) within 90 days of its letter, contact the FBI's public liaison, and/or seek dispute resolution services by contacting the Office of Government Information Services (OGIS). (Ex. B.)

---

[3] The FBI inadvertently failed to check the box advising Plaintiff that its request for a public interest fee waiver was under consideration in its initial acknowledgement letter. Nevertheless, the FBI noted Plaintiff's fee waiver request.

8.    By letter dated October 3, 2022, the FBI informed Plaintiff it requested information on one or more third party individuals and the FBI would neither confirm nor deny the existence of such records pursuant to FOIA Exemptions 6 and 7(C), 5 U.S.C. 552(b)(6) and (b)(7)(C). The FBI advised that the mere acknowledgement of the existence of FBI records on third party individuals could reasonably be expected to constitute an unwarranted invasion of personal privacy and that this is the FBI's standard response to such requests and should not be taken to mean that records did, or did not, exist. This response pertained only to subpart ten of Plaintiff's request which specifically sought communications allegedly made by a named non-executive FBI employee. Additionally, the FBI advised it was closing Plaintiff's request. The FBI instructed Plaintiff to visit www.fbi.gov/foia and select "Services," "Information Management," and "Freedom of Information/Privacy Act" for more information about making requests for records on third party individuals (living or deceased). Finally, the FBI informed Plaintiff it could contact the FBI's public liaison, seek dispute resolution services through the OGIS, or they could appeal the FBI's determination by writing to the Director, OIP, within 90 days of the FBI's letter. (Ex. C.)

PLAINTIFF'S APPEAL OF FOIPA REQUEST NUMBER 1560664-000<br>AND CIVIL ACTION FILING

9.    By letter dated November 3, 2022, Plaintiff submitted an administrative appeal to OIP challenging the FBI's determination in response to FOIPA Request Number 1560664-000. Specifically, Plaintiff challenged the FBI's determination that the mere acknowledgement of the existence of FBI records on third party individuals could reasonably be expected to constitute an unwarranted invasion of personal privacy. (Ex. D.)

5

10. By letter dated November 3, 2022, OIP acknowledged receipt of Plaintiff's appeal of the FBI's determination in FBI FOIPA Request Number 1560664-000. OIP advised Plaintiff it assigned its appeal number A-2023-00201. (Ex. E.)

11. On December 13, 2022, Plaintiff filed the Complaint in this civil action. (ECF No. 1.)

12. By letter dated January 20, 2023, OIP informed Plaintiff that it was affirming the FBI's action in response to Plaintiff's FOIPA Request Number 1560664-000. OIP advised Plaintiff that the FBI properly refused to confirm or deny the existence of records responsive to its request and that confirming or denying the existence of such records, including law enforcement records concerning a third-party individual, would constitute a clearly unwarranted invasion of personal privacy, and could reasonably be expected to constitute an unwarranted invasion of personal privacy.[4] Finally, OIP advised Plaintiff that if dissatisfied with OIP's determination, Plaintiff could file a lawsuit in federal district court or seek mediation services from OGIS. (Ex. F.)

## THE FBI'S RESPONSES TO PLAINTIFF'S REQUEST

13. The FBI has maintained its *Glomar* to subpart ten of Plaintiff's request.[5] For the remaining subparts, the FBI conducted a search for potentially responsive records.[6] As a result of the search, responsive records were located and the FBI turned to making monthly interim releases to Plaintiff.

---

[4] OIP clarified that the FBI's October 3, 2022 response only pertained to subpart 10 of Plaintiff's August 31, 2022 FOIPA request.

[5] Plaintiff is not challenging this *Glomar* so this declaration will not defend it further.

[6] Plaintiff is not challenging the FBI's search, so this declaration will not defend it further.

14.    By letter dated October 16, 2023, the FBI made its first interim release of records to the Plaintiff, advising that 387 pages of records were reviewed, and 180 pages of records were being released in full or part, with certain information exempted pursuant to FOIA Exemptions 5, 6, 7(C), and 7(E). Plaintiff was advised that some of the responsive records could not be released because they were subject to a Court's Sealing Order. Additionally, the FBI advised Plaintiff that some of the withheld pages were consulted to other government agencies (OGAs) and the FBI would communicate with Plaintiff once the OGAs' responses were received. Lastly, the FBI advised Plaintiff that it could appeal the FBI's response to OIP, within 90 days of the date of its letter, contact the FBI's public liaison, or seek dispute resolution services by contacting OGIS. (Ex. G.)

15.    By letter dated March 8, 2024, the FBI made its second interim release of records to the Plaintiff, advising that 34 pages of records were reviewed, and 32 pages of records were being released in full or part, with certain information exempted pursuant to FOIA Exemptions 3, 5, 6, 7(C), and 7(E). This release contained pages that were previously consulted with OGAs. The OGAs which withheld information included DOJ – National Security Division (NSD), Department of Homeland Security (DHS), Department of State (DOS), Executive Office for United States Attorneys (EOUSA), and the Office of the Director of National Intelligence (ODNI). Lastly, the FBI advised Plaintiff that it could appeal the FBI's response to OIP, within 90 days of the date of its letter, contact the FBI's public liaison, or seek dispute resolution services by contacting OGIS. (Ex. H.)

16.    By letter dated September 30, 2024, the FBI made its third interim release of records to the Plaintiff, advising that 509 pages of records were reviewed, and 364 pages of records were being released in full or part, with certain information exempted pursuant to FOIA

Exemptions 3, 5, 6, 7(C), and 7(E). Plaintiff was advised that some of the responsive records could not be released because they were subject to a Court's Sealing Order. Additionally, the FBI advised Plaintiff that some of the withheld pages were consulted to OGAs and the FBI would communicate with the Plaintiff once the OGAs' responses were received. Lastly, the FBI advised Plaintiff that it could appeal the FBI's response to OIP, within 90 days of the date of its letter, contact the FBI's public liaison, or seek dispute resolution services by contacting OGIS. (Ex. I.)

17.     By letter dated October 30, 2024, the FBI made its fourth interim release of records to the Plaintiff, advising that 277 pages of records were reviewed, and 137 pages of records were being released in full or part, with certain information exempted pursuant to FOIA Exemptions 5, 6, 7(C), and 7(E). The FBI advised Plaintiff that some of the withheld pages were consulted to OGAs and the FBI would communicate with the Plaintiff once the OGAs' responses were received. Lastly, the FBI advised Plaintiff that it could appeal the FBI's response to OIP, within 90 days of the date of its letter, contact the FBI's public liaison, or seek dispute resolution services by contacting OGIS. (Ex. J.)

18.     By letter dated November 29, 2024, the FBI made its fifth interim release of records to the Plaintiff, advising that 9 pages of records were reviewed, and 9 pages of records were being released in full or part, with certain information exempted pursuant to FOIA Exemptions 3, 6, 7(C), and 7(E). This release contained pages that were previously consulted with OGAs. The OGAs which withheld information included DOJ – Civil Rights Division (CRT), DOS, and EOUSA. Lastly, the FBI advised Plaintiff that it could appeal the FBI's response to OIP, within 90 days of the date of its letter, contact the FBI's public liaison, or seek dispute resolution services by contacting OGIS. (Ex. K.)

8

19.    By letter dated December 30, 2024, the FBI made its sixth interim release of records to the Plaintiff, advising that 15 pages of records were reviewed, and 15 pages of records were being released in full or part, with certain information exempted pursuant to FOIA Exemptions 3, 5, 6, 7(C), and 7(E). This release contained pages that were previously consulted with OGAs. The OGAs which withheld information included DOJ – Office of Inspector General (OIG), DHS, and ODNI. Lastly, the FBI advised Plaintiff that it could appeal the FBI's response to OIP, within 90 days of the date of its letter, contact the FBI's public liaison, or seek dispute resolution services by contacting OGIS. (Ex. L.)

20.    By letter dated May 30, 2025, the FBI made its seventh interim release of records to the Plaintiff, advising that 8 pages of records were reviewed, and 8 pages of records were being released in full or part, with certain information exempted pursuant to FOIA Exemptions 5, 6, 7(C), and 7(E). This release contained pages that were previously consulted with OGAs. The OGA which withheld information was DOJ – Criminal Division (CRM). Lastly, the FBI advised Plaintiff that it could appeal the FBI's response to OIP, within 90 days of the date of its letter, contact the FBI's public liaison, or seek dispute resolution services by contacting OGIS. (Ex. M.)

21.    By letter dated September 29, 2025, the FBI made its eighth and final release of records to the Plaintiff, advising that 8 pages of records were reviewed, and 2 pages of records were being released in full or part, with certain information exempted pursuant to FOIA Exemptions 3, 6, 7(C), and 7(E). This release contained pages that were previously consulted with OGAs. The OGAs which withheld information included DHS – Cybersecurity Infrastructure and Security Agency (CISA) and ODNI. Lastly, the FBI advised Plaintiff that it could appeal the FBI's response to OIP, within 90 days of the date of its letter, contact the FBI's public liaison, or seek dispute resolution services by contacting OGIS. (Ex. N.)

## PART II: JUSTIFICATION FOR NON-DISCLOSURE UNDER THE FOIA

22.    The FBI processed all records responsive to Plaintiff's request to achieve maximum disclosure consistent with the access provisions of the FOIA. Every effort was made to provide Plaintiff with all reasonably segregable, non-exempt information. The FBI did not withhold any reasonably segregable, nonexempt portions from Plaintiff. Further description of the information withheld, beyond what is provided in this declaration, could reveal the actual exempt information and any further attempt of segregating material from the records would employ finite resources only to produce disjointed words, phrases, or sentences, that would have minimal or no informational content. The FBI withheld information pursuant to FOIA Exemptions 5, 6, 7(C), and 7(E) on the pages specifically challenged by Plaintiff, as further described below. This declaration does not detail any exemptions the FBI applied on pages that Plaintiff did not challenge. Additionally, on pages that Plaintiff did challenge, this declaration only details the exemptions Plaintiff challenged on those pages and not any additional exemptions cited on those pages that Plaintiff decided to not challenge. In several instances, Plaintiff challenged certain exemptions on a page, but not every exemption asserted on that page. In those instances, the FBI is only defending the challenged exemptions.[7]

### BATES NUMBERING, JUSTIFICATION CODES, AND INDEX

23.    *Bates Numbering & Index:* The FBI numbered all pages of its production consecutively as Bates pages FBI (22-cv-3711)-1 through FBI (22-cv-3711)-1173. On the pages released in full and in part, these numbers are typically located at the bottom of each page.

---

[7] This includes instances where an exemption code (*see* Paragraph 24) was challenged on one page, but not on another otherwise challenged page. For example, if (b)(7)(E)-5 appears on both pages 1 and 2, Plaintiff challenged (b)(7)(E)-5 on page 1 but only other exemptions on page 2, this declaration would not include a justification for (b)(7)(E)-5 on page 2.

Additionally, included as an exhibit to this declaration is an index that provides a description of each page the Plaintiff is challenging and indicates the specific FOIA exemptions asserted. (Ex. O.) Any pages not specifically challenged by the Plaintiff are not included.

24.    *Justification Codes:* On the Bates-numbered pages provided to Plaintiff and on pages withheld in full or part and accounted for in the FBI's index, the FBI further categorized its application of exemptions to better explain the nature of the information withheld pursuant to the provisions of the FOIA. Particularly, the FBI applied numerical codes that coincide with specific categories of exempt information. This declaration and index demonstrate that all information withheld by the FBI is exempt from disclosure pursuant to the cited FOIA exemptions or is so intertwined with non-exempt information that segregation is not possible without revealing the underlying exempt information.

25.    Each instance of information withheld pursuant to a FOIA exemption is accompanied by a coded designation that corresponds to one of the categories listed below.[8] For example, if "(b)(7)(E)-4" appears on a page, the "(b)(7)(E)" designation refers to FOIA Exemption 7(E) protecting against the release of non-public details concerning law enforcement techniques and procedures. The numerical designation "4" following "(b)(7)(E)" narrows the main category into a more specific subcategory, such as "Collection and Analysis of Information."

---

[8] The FBI has implemented standard codes for justification categories. Not all codes are applicable in each FOIA litigation; therefore, the codes in the below "Summary of Exemption Categories" chart may not be sequential if certain codes are not relevant to the records at issue.

| SUMMARY OF FOIA EXEMPTION JUSTIFICATION CATEGORIES | | |
|---|---|---|
| **CODED CATEGORIES** | **INFORMATION WITHHELD** | **BATES PAGE LOCATION** |
| **EXEMPTION (b)(5)** | **PRIVILEGED INFORMATION** | |
| (b)(5)-1 | Deliberative Process Privilege | FBI (22-cv-3711)-66, 94, 96, 97, 124, 126-127, 129-130, 189, 194, 197, 202, 239, 243, 257, and 260 |
| **EXEMPTIONS (b)(6) & 7(C)** | **CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY** | |
| (b)(6)-3 & (b)(7)(C)-3 | Names and Identifying Information of Third Parties Merely Mentioned | FBI (22-cv-3711)-762 |
| (b)(6)-4 & (b)(7)(C)-4 | Names and Identifying Information of Third Parties of Investigative Interest | FBI (22-cv-3711)-629-631 and 762 |
| (b)(6)-5 & (b)(7)(C)-5 | Names and Identifying Information of Non-FBI Federal Government Personnel | FBI (22-cv-3711)-199 and 1038 |
| **EXEMPTION (b)(7)(E)** | **LAW ENFORCEMENT INVESTIGATIVE TECHNIQUES AND PROCEDURES** | |
| (b)(7)(E)-3 | FBI Internal E-mail Addresses and Telephone Numbers | FBI (22-cv-3711)-94 and 419 |
| (b)(7)(E)-4 | Collection and Analysis of Information | FBI (22-cv-3711)-1, 66, 94, 96-97, 126, 129, 183-190, 195-199, 203-204, 206-208, 210-213, 239, 243, 249, 257, 260, 291-292, 294-295, 326-331, 391, 419, 422, 495-500, 502, 504, 509, 516, 527-531, 540-541, 562-563, 570-573, 576, 581-582, 606-607, 628-631, 637-640, 660-661, 663-665, 740, 744-745, 757, 762, 774, 794, 802, 842, 844-845, 856-858, 881-882, 897-899, 945, 949, 1033, 1035, 1039, 1103, and 1169 |
| (b)(7)(E)-5 | Investigative Focus of Specific Investigation | FBI (22-cv-3711)-391 |
| (b)(7)(E)-14 | Non-Public Coordination with Other Government Agencies (OGAs) | FBI (22-cv-3711)-5, 516, 562-563, and 581-582 |

## EXEMPTION 5 – PRIVILEGED INFORMATION

26.     Exemption 5 of the FOIA exempts from mandatory disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Exemption 5 has been construed to

exempt documents or information normally privileged in the civil discovery context and incorporates the deliberative process privilege. In order to apply Exemption 5, agencies must first satisfy the threshold requirement – i.e., show that the information protected was "inter-agency" or "intra-agency." Once the threshold is satisfied, agencies must satisfy the elements of the pertinent privilege. As discussed in detail below, the information withheld by the FBI pursuant to FOIA Exemption 5 is intra-agency communications which fall squarely within the deliberative process privilege.

*Inter-/Intra-Agency Threshold*

27.    The information withheld by the FBI consists of portions of email communications exchanged between government employees, including attorneys from various FBI field offices, FBI operational divisions, and from the FBI's Office of General Counsel (OGC). As such, they are intra-agency communication documents within the threshold of Exemption 5.

*(b)(5)-1: Deliberative Process Privilege*

28.    The deliberative process privilege protects predecisional, deliberative communications that are part of a process by which agency decisions are made. It protects opinions, advice, evaluations, deliberations, proposals, or recommendations that form part of an agency decision-making process, as well as the selection and sorting of factual information relied upon as part of the decision-making process. Agencies must show that the withheld information was both predecisional – i.e., antecedent to a final agency decision – and deliberative – i.e., part of the process in which the agency engaged in an effort to reach a final decision (whether or not any final decision was ever reached). The purpose of the deliberative process privilege is to protect the internal deliberations of the government by insulating recommendations, analyses,

13

opinions, and other non-factual information comprising the decision-making process. In turn, Exemption 5 allows for the withholding of such privileged material – i.e., material that contains, or was prepared in connection with the formulation of, opinions, advice, evaluations, deliberations, policies, proposals, conclusions, or recommendations. The privilege also protects records and information that, if disclosed, would reveal the agency's collection of multitudinous facts, and the sorting, evaluation, and analysis of those facts in order to make recommendations or reach a final agency decision. Additionally, in compliance with the FOIA Improvement Act of 2016, the records must have been created less than 25 years before the submission of the FOIA request.

29.    Exemption 5, when asserted in conjunction with the deliberative process privilege, is predicated on the recognition that release of this privileged information would inhibit the government's development of policy and stifle its decision-making process. Furthermore, exempting such documents from disclosure also protects against public confusion that might result from preliminary disclosure of opinions and information that do not, in fact, reflect the final views or policies of the FBI. The exemption and privilege together protect not only documents but also the integrity of the deliberative process itself where exposure of the process would result in harm. The FBI invokes Exemption 5 and the deliberative process privilege because FBI employees would hesitate to offer their candid and conscientious opinions to superiors or coworkers if they knew that their opinions of the moment might be made a matter of public record at some future date, and because such self-censorship would, in turn, degrade the quality of agency decisions by depriving the decision-makers of fully explored options developed from robust debate.

*The FBI's Assertion of Exemption 5 and the Deliberative Process Privilege
to the Email Communications at Issue Here*

30.     Within the records at issue here, the FBI relied on Exemption 5 and the Deliberative Process Privilege to protect portions of privileged, deliberative, and pre-decisional email communications exchanged between government employees, including attorneys from various FBI field offices, FBI operational divisions, and from the FBI's OGC.[9] These communications reflect deliberations between these government employees, based on specific selected facts and details exchanged and debated amongst these employees. In many instances, the selection and sorting of factual information relied upon as part of the decision-making process is information provided by a private entity or from another agency. In compliance with the FOIA Improvement Act of 2016, these communications were created less than 25 years before the submission of Plaintiff's request.

31.     The FBI determined that portions of these email communications were deliberative and pre-decisional because they reflect inter-agency deliberations as agency employees are requesting and providing feedback, making proposals and recommendations, and working to come to a consensus on final agency decisions about assessing the overall threat of malign foreign influence on United States' social media companies and specific actions that

---

[9] The specific information withheld in Exemption category (b)(5)-1 is redacted on Bates pages FBI (22-cv-3711)-66, 94, 96, 97, 124, 126-127, 129-130, 189, 194, 197, 202, 239, 243, 257, and 260. This exemption appears on other pages in the Vaughn index (Ex. O), but Plaintiff did not challenge its use on those pages. The FBI has withdrawn its assertion of Exemption 5 and the Deliberative Process Privilege on Bates page FBI (22-cv-3711)-1 because the FBI determined, upon further review, that this particular email communication did not fall withing the threshold. However, the information remains withheld pursuant to other applicable exemptions. Additionally, the FBI has withdrawn its assertion of Exemption 5 and the Deliberative Process Privilege on Bates page FBI (22-cv-3711)-1038 because the FBI determined, upon further review, that this particular email communication did not fall withing the threshold. A reprocessed copy of Bates page FBI (22-cv-3711)-1038 is available for review in Exhibit P.

should be taken to alert social media companies of these threats. The email communications contain the opinions, analysis, and recommendations of federal government employees as part of a decision-making process.

October 26, 2020 Email Communication

32.     In this email communication, FBI field office, operational division, and OGC personnel are attempting to reach consensus about whether to advise, and how to effectively advise, social media company personnel about specific threats.[10]

33.     The parties taking part in the deliberation include FBI Supervisory Special Agents (SSA), Special Agents (SA), and general attorneys. This email communication is the primary vehicle enabling FBI personnel to discuss whether or not to share information the FBI collected with a social media company. Even more, this deliberative communication provides the forum for government personnel to author and share raw opinions and analysis on if the information collected is even worthy of sharing with a social media company.

34.     The author, recipient, and copied participants of the email chain served in the FBI's San Francisco (SF) field office, FBI's Counterintelligence Division (CD) Foreign Influence Task Force (FITF), and the FBI's OGC National Security & Cyber Law Branch (NSCLB). These individuals are subject-matter experts attempting to reach a consensus on final agency decisions about assessing the overall threat of malign foreign influence on United States' social media companies and specific actions that should be taken to alert social media companies of these threats.

---

[10] The FBI is referencing the specific information withheld with Exemption category (b)(5)-1 on Bates pages FBI (22-cv-3711)-66, 94, and 96-97.

16

October 28, 2020 Email Communication

35.     In the October 28, 2020 email communication at issue, FBI field office and Office of Public Affairs (OPA) personnel debate how the FBI could respond to press inquiries regarding a potential election threat, including whether or not the FBI should alert social media companies of certain tips and threats received and on whether or not the social media companies responses and related actions would impact the FBI and its investigative activities.[11]

36.     The parties taking part in the deliberation include FBI SSAs and FBI media/press coordinators. This email communication is the deliberative process allowing FBI employees to articulate the pros and cons of how to proceed with media engagement and future interaction with social media companies. Government personnel are sharing unrefined recommendations and analysis in this communication.

37.     The author, recipient, and copied participants of the email chain served in the FBI's SF field office and the FBI's National Press Office (NPO). These individuals are engaged in a decision-making process of how best to respond to this particular and future media inquiries while also providing analysis and insight to social media companies threatened by potential malevolent foreign influence in the United States' election process.

June 2, 2020 Email Communication

38.     In this email communication, FBI field office and operational division personnel are attempting to reach consensus on recommendations and feedback on the notification process

---

[11] The FBI is referencing the specific information withheld with Exemption category (b)(5)-1 on Bates pages FBI (22-cv-3711)-124, 126-127, and 129-130.

17

and associated investigative strategy of referring posts to Twitter which possibly violate Twitter's terms of service.[12]

39.     The parties taking part in the deliberation include FBI SSAs, SAs, and Intelligence Analysts (IAs). The email communication serves as an open forum for FBI employees to willingly and unabashedly share their opinions and recommendations regarding the notification process of Twitter terms of service violations and subsequent investigative activities undertaken in response to such violations.

40.     The author, recipient, and copied participants of the email chain served in the FBI's SF field office, FBI's CD FITF, and FBI OGC. Government personnel specializing in coordination and information sharing with social media companies are communicating on notification/reporting processes to the San Francisco Emergency Operations Center (EOC) and whether or not additional engagement with FBI field offices is necessary regarding these specific violation incidents.

*Conclusion on Exemption 5 – Deliberative Process Privilege*

41.     Overall, these employees' preliminary evaluation, opinions, suggestions, and recommendations concerning the range of potential actions that could be taken and the possible outcomes concerning certain threats and tips received by the FBI, and which were of common interest to the FBI and social media companies, were key to a decision-making process aimed at reaching best agency decisions on how to best communicate certain threats involving social media companies. Other portions of these communications included debate about which of the selected tips and threats the FBI received were sufficiently credible and deemed relevant to the

---

[12] The FBI is referencing the specific information withheld with Exemption category (b)(5)-1 on Bates pages FBI (22-cv-3711)-189, 194, 197, 202, 239, 243, 257, and 260.

safety and security of the social media companies' operations and to national security. Portions of the emails included debate between FBI personnel, including personnel from the FBI's OPA and certain FBI operational divisions and field offices on how the FBI could potentially respond on these topics, including whether or not the FBI should alert social media companies of certain tips and threats received and on whether or not the social media companies responses and related actions would impact the FBI and its investigations. The emails reflect employees' analysis and recommendations concerning potential inauthentic behavior on social media platforms, possible disinformation campaigns, and other nefarious actions by domestic and foreign actors designed to propagate malign influence in the United States' election process. The FBI determined that the withheld portions of these emails were exchanged between federal government personnel, were pre-decisional and deliberative in that they do not reflect final agency decisions, and were created less than 25 years before the Plaintiff's request.

42.    The reasonably foreseeable harm in disclosure of the withheld portions of the email exchanges at issue here is that there would be a chilling effect on these and other agency employees' willingness to share such raw, unrefined ideas and their candid feedback should they know it would become subject to public disclosure. Release would set a dangerous precedent as the FBI would be seen as unwilling to shield its employees' deliberations from public scrutiny and would result in hesitancy to participate fully in such deliberations in the future. Additionally, release of this pre-decisional deliberative material would create public confusion as this material predates the final agency decisions, potentially casting doubt on the accuracy of the actual, final agency decisions and cause public misunderstanding as to what the actual FBI decisions are. Disclosure of FBI employees' preliminary thoughts and analysis would be negatively perceived by the social media companies discussed in these emails, resulting in a loss of the cooperation

19

and trust gained through these partnerships, diminishing the FBI's ability to combat certain areas of criminal activity and threats to national security.

43.    For the reasons discussed above, the FBI properly applied the deliberative process privilege under Exemption 5 to withhold pre-decisional and deliberative information in portions of these internal emails. The FBI segregated non-deliberative facts, whenever possible, and only withheld such material when it found it was inextricably intertwined with agency deliberations and determined that foreseeable harm would result from disclosure.

## EXEMPTION 7 THRESHOLD

44.    Before an agency can invoke any of the harms enumerated in Exemption 7, it must first demonstrate that the records or information at issue were compiled for law enforcement purposes. Pursuant to 28 USC §§ 533, 534, and Executive Order 12,333 as implemented by the Attorney General's Guidelines for Domestic FBI Operations (AGG-DOM) and 28 CFR § 0.85, the FBI is the primary investigative agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency, to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security, and further the foreign intelligence objectives of the United States. Under this investigative authority, the responsive records herein were compiled and/or created in furtherance of FBI's law enforcement, national security, and intelligence missions. To accomplish these missions, inherent tasks and operational functions are required, to include the identification of, development, and implementation of law enforcement and intelligence gathering methods, techniques, procedures, and guidelines.

45.    Among these tasks and operational functions is the FBI's proactive engagement in collaborative and coordinated partnerships with social media companies to retrieve specific

information to aid in the fulfillment of the FBI's dual criminal and national security focus. These specific records at issue were created in furtherance of the FBI's law enforcement mission. Specifically, these records include the FBI's efforts to coordinate with social media companies to combat foreign adversaries from conducting disinformation campaigns directed at the United States and possibly attempting to interfere with a United States election. Further, the records include the FBI's coordination with social media companies to detect activity from foreign adversaries on their platforms, analyze foreign adversaries' disinformation campaigns, and assess the overall threat of malign foreign influence on the social media platforms. In sum, the records at issue document the FBI's work to thwart criminal activity, combat national security threats, and defend the homeland. Considering these records were compiled to document the FBI's investigation of potential crimes and/or possible threats to national security, the FBI determined they were compiled for law enforcement purposes.

## FOIA EXEMPTIONS 6 AND 7(C)
## CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY

46.     Exemption 6 exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). All information that applies to a particular person falls within the scope of Exemption 6.

47.     Exemption 7(C) similarly exempts from disclosure "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).[13]

---

[13] The practice of the FBI is to assert Exemption 6 in conjunction with Exemption 7(C). Although the balancing test for Exemption 6 uses a "would constitute a clearly unwarranted invasion of personal privacy" standard and the test for Exemption 7(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the

48.    When withholding information pursuant to these two exemptions, the FBI is required to balance the privacy interests of the individuals mentioned in these records against any public interest in disclosure. In asserting these exemptions, each piece of information was scrutinized to determine the nature and strength of the privacy interest of every individual whose name and/or identifying information appears in the documents at issue. When withholding the information, the individual's privacy interest was balanced against the public's interest in disclosure. For purposes of these exemptions, a public interest exists only when an individual's identifying information[14] would shed light on the FBI's performance of its mission to protect the American people and uphold the Constitution of the United States, and its function to: protect the United States from terrorist attack; protect the United States against foreign intelligence, espionage, and nefarious cyber operations; combat significant criminal cyber activity, public corruption, transnational criminal enterprises, white-collar crime, and violent crime; and protect civil rights. In each instance wherein information was withheld pursuant to Exemptions 6 and 7(C), the FBI determined that the individuals' privacy interests outweighed any public interest in disclosure.

49.    Furthermore, considering privacy concerns are typically obviated once an individual is deceased,[15] when processing FOIPA requests, the FBI takes several steps to ascertain the current life/death status of the individuals whose names are withheld. The FBI uses

---

analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion. The privacy interests are balanced against the public's interest in disclosure under both exemptions.

[14] Hereafter, identifying information includes the following: name, dates of birth, residences, telephone numbers, social security numbers, and social media account information.

[15] In some circumstances, surviving relatives of a deceased individual retain privacy interests in their information, even after the individual's death. See generally *National Archives v. Favish*, 124 S. Ct. 1570 (2004).

22

the birth date and/or the date of the investigation to determine whether an individual is living or deceased, to the extent either or both of these pieces of information are discernable from the file. The date of birth is used to apply the judicially recognized "100-year rule," i.e., if the individual was born more than 100 years ago, the FBI presumes that he or she is dead and the name is released. The FBI also uses institutional knowledge gained from prior FOIA requests or internal records. By using institutional knowledge, the FBI can identify with sufficient certainty the life/death status of certain individuals. If the FBI is unable to determine the life/death status of an individual through the use of these methods, the name of the individual is withheld pursuant to Exemptions 6 and 7(C), when it finds disclosure would constitute an unwarranted invasion of those individuals' privacy should they still be living, and no public interest would be served in releasing the names. It is also the FBI's policy to release names of high-ranking FBI officials as well as individuals in public positions, as they have diminished privacy rights while acting in their official capacity. This policy is applied to the individual's position at the time of the document, and not the present.

*(b)(6)-3 and (b)(7)(C)-3: Names and Identifying Information of*
*Third Parties Merely Mentioned*

50. In Exemption category (b)(6)-3 and (b)(7)(C)-3, the FBI withheld the names and identifying information of third parties who were merely mentioned in the investigative records responsive to Plaintiff's request.[16] The FBI has information about these third parties in its records because these individuals were tangentially mentioned in conjunction with FBI investigative efforts. These individuals were not of investigative interest to the FBI. These third

---

[16] Exemption Coded Category (b)(6)-3 and (b)(7)(C)-3 has been asserted on Bates page FBI (22-cv-3711)-762. This exemption appears on other pages in the Vaughn index (Ex. O), but Plaintiff did not challenge its use on those pages.

23

parties maintain substantial and legitimate privacy interests in not having this information disclosed and thus, being connected with an FBI law enforcement matter. Considering the FBI is an investigative and intelligence agency, disclosure of these third parties' names and identifying information in connection with FBI records carries an extremely negative connotation. Disclosure of their identities would subject these individuals to possible harassment or criticism and focus derogatory inferences and suspicion on them. The FBI then considered whether there was any public interest that would override these privacy interests and concluded that disclosing information about individuals who were merely mentioned in FBI investigative records would not significantly increase the public's understanding of the operations and activities of the FBI. Accordingly, the FBI properly protected these individuals' privacy interests pursuant to FOIA Exemptions 6 and 7(C).

### (b)(6)-4 and (b)(7)(C)-4: Names and Identifying Information of Third Parties of Investigative Interest

51.      In Exemption category (b)(6)-4 and (b)(7)(C)-4, the FBI withheld the names and identifying information of third parties who were of investigative interest to the FBI.[17] Being identified as a subject of FBI investigative interest carries a strong negative connotation and a stigma, whether or not these individuals ever committed criminal acts. Release of the identities of these individuals to the public could subject them to harassment or embarrassment, as well as undue public attention. Furthermore, it could result in professional and social repercussions, due to resulting negative stigmas. Accordingly, the FBI determined these individuals maintain substantial privacy interests in not having their identities disclosed. In contrast, disclosing

---

[17] Exemption Coded Category (b)(6)-4 and (b)(7)(C)-4 has been asserted on Bates pages FBI (22-cv-3711)-629-631 and 762. This exemption appears on other pages in the Vaughn index (Ex. O), but Plaintiff did not challenge its use on those pages.

personal information about these individuals would not significantly increase the public's understanding of the FBI's performance of its mission and so the FBI concluded that there was no public interest here sufficient to override these individuals' substantial privacy interests. For these reasons, the FBI properly withheld this information pursuant to Exemptions 6 and 7(C).

### (b)(6)-5 and (b)(7)(C)-5: Names and Identifying Information of Non-FBI Federal Government Personnel

52.    In Exemption category (b)(6)-5 and (b)(7)(C)-5, the FBI withheld the names of personnel from non-FBI federal government agencies who provided information to or otherwise assisted the FBI in its collaborative partnership with social media companies to further its investigative mission and priorities.[18] The FBI protected names of individuals from other DOJ components who are integral to the development and strengthening of partnerships core to the FBI's investigative priorities. The rationale for protecting the identities of other government employees is the same as the rationale for protecting the identities of FBI employees. Assignment of personnel from non-FBI federal agencies to a particular investigative activity is not by choice. Publicity, adverse or otherwise, concerning the assistance of these other agency employees in an FBI investigative activity would seriously impair their effectiveness in assisting or participating in future FBI investigative activities. The privacy consideration also protects these individuals from unnecessary, unofficial questioning as to the FBI investigation. It is possible for a person targeted by law enforcement action to carry a grudge which may last for years, and to seek revenge on the personnel involved in the investigative activities at issue in these FBI records. The publicity associated with the release of their names in connection with

---

[18] Exemption Coded Category (b)(6)-5 and (b)(7)(C)-5 has been asserted on Bates pages FBI (22-cv-3711)-199 and 1038. This exemption appears on other pages in the Vaughn index (Ex. O), but Plaintiff did not challenge its use on those pages.

these investigative activities could trigger hostility towards them by such persons. Therefore, these employees maintain substantial privacy interests in not having their identities disclosed in this context. In contrast, there is no public interest to be served by the disclosure of these employees' names because their identities, by themselves, would not demonstrate how the FBI performed its statutory mission and thus, would not significantly increase the public's understanding of the FBI's operations and activities. Accordingly, the FBI properly protected these employees' privacy interests pursuant to FOIA Exemptions 6 and 7(C).

## EXEMPTION (b)(7)(E)
## LAW ENFORCEMENT INVESTIGATIVE TECHNIQUES AND PROCEDURES

53.    FOIA Exemption 7(E) provides protection for "law enforcement records [which]…would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law. 5 U.S.C. § 552(b)(7)(E).

54.    The FBI asserted Exemption 7(E) to withhold information from these records, the release of which would disclose techniques and/or procedures for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

55.    Within the responsive documents, the FBI applied Exemption 7(E) to non-public investigative techniques and procedures utilized by the FBI to pursue its law enforcement mission, and also to non-public details about techniques and procedures that are otherwise known to the public. Specifically, the FBI asserted Exemption 7(E) to protect the following categories of information: internal e-mail addresses and phone numbers, techniques of collection and analysis of information, investigative focus of investigations, and details of the FBI's non-public coordination with other government agencies.

*(b)(7)(E)-3: FBI Internal E-mail Addresses and Telephone Numbers*

56.     In Exemption category (b)(7)(E)-3, the FBI withheld internal e-mail addresses and telephone numbers.[19] These email addresses and telephone numbers are core communication tools utilized by the FBI in its law enforcement investigations and investigative activities. More specifically, this type of information could provide criminals with specific targets for possible cyber-attacks and other types of attacks on FBI secure communications. Considering the current cyber-security environment where government data breaches and other hacking attempts on government systems are prevalent, it is likely that the release of this type of information could provide hackers with avenues to exploit the FBI's Information Technology system. It is possible they could use this information to gain unauthorized access to FBI systems, view and/or manipulate sensitive investigative data, interfere with the FBI's non-public intranet protocol, and/or hinder the FBI's ability to enforce the law by disrupting the FBI's internal communications. Releasing this information poses substantial risks to FBI information systems, could potentially decrease the FBI's effectiveness, and could enable criminals to circumvent the law. Accordingly, the FBI asserted Exemption 7(E) to withhold this information.

*(b)(7)(E)-4: Collection and Analysis of Information*

57.     In Exemption category (b)(7)(E)-4, the FBI protected non-public, sensitive investigative methods the FBI uses to collect and analyze information it obtains for investigative purposes.[20] In the records at issue, the release of the non-public investigative techniques would

---

[19] Exemption Coded Category (b)(7)(E)-3 has been asserted on Bates page FBI (22-cv-3711)-94 and 419. This exemption appears on other pages in the Vaughn index (Ex. O), but Plaintiff did not challenge its use on those pages.

[20] Exemption Coded Category (b)(7)(E)-4 has been asserted on Bates pages FBI (22-cv-3711)-1, 66, 94, 96-97, 126, 129, 183-190, 195-199, 203-204, 206-208, 210-213, 239, 243, 249, 257, 260, 291-292, 294-295, 326-331, 391, 419, 422, 495-500, 502, 504, 509, 516, 527-531, 540-541, 562-563, 570-573, 576, 581-582, 606-607, 628-631, 637-640, 660-661, 663-665, 740, 744-745, 757,

disclose the identity of methods used in the collection and analysis of information, including how and from where the FBI collects information and the methodologies employed to analyze it once collected. These methods are still in use today.

58.     The FBI employs these non-public, sensitive investigative methods to collect and analyze detailed information which informs the FBI's decision-making in pursuit of its dual criminal and national security mission. Specifically, the FBI utilized these investigative methods to collect and analyze specific portions of both non-public and public source information to launch investigative activities geared towards eliminating the prospective threat of foreign disinformation and malign influence on social media platforms and by extent, prevent the infiltration of foreign influence in the United States' election process. These investigative methods, the details of which have not been publicly disclosed, were used to detect potential activity from foreign adversaries on social media platforms, analyze and respond to potential disinformation campaigns from foreign adversaries, and assess the overall threat of malign foreign influence on the social media platforms.

59.     Disclosure of these investigative methods used in the collection and analysis of information would enable subjects of FBI investigations and particularly, foreign adversaries to circumvent these or similar currently used techniques. Individuals who have knowledge of this withheld information would be able to use that knowledge to devise methods to circumvent the technique by altering their activities in a manner that would allow malevolent actors to exploit these valuable investigative tools and render the efficacy of the FBI's collection method moot.

762, 774, 794, 802, 842, 844-845, 856-858, 881-882, 897-899, 945, 949, 1033, 1035, 1039, 1103, and 1169.

28

60.     Additionally, the relative utility of these non-public, sensitive techniques could be diminished if the actual techniques were released in this matter. This in turn would facilitate the accumulation of information by investigative subjects, malicious actors, and hostile foreign governments regarding the circumstances under which the specific techniques were used or requested and the usefulness of the information obtained. Release of this type of information would enable criminals to educate themselves about the specific investigative techniques employed for the collection and analysis of information and therefore, allow these individuals to take countermeasures to circumvent the effectiveness of these techniques and to continue to violate the law and engage in intelligence, terrorist, cyberespionage, and other criminal activities. Accordingly, the FBI has properly withheld this information pursuant to FOIA Exemption 7(E).

*(b)(7)(E)- 5: Investigative Focus of Specific Investigation*

61.     In Exemption category (b)(7)(E)-5, the FBI protected the focuses of specific FBI counterintelligence investigative activities.[21] These focuses have not been publicly disclosed. Revealing this information to investigative targets would alert them to the FBI's interest in their activities, allowing them to take active measures to conceal and destroy evidence or modify their behavior to avoid future investigative scrutiny. Additionally, revealing the broader investigative focuses of interconnected counterintelligence investigations would reveal the scope of the FBI's gathered evidence and intelligence on foreign actors potentially propagating malign influence on United States' elections, connections it has discovered between different foreign adversaries, and the strategies it plans to pursue to prevent or disrupt further criminal and national security threats. This would allow these foreign adversaries to predict the FBI's investigative strategies

---

[21] Exemption Coded Category (b)(7)(E)-5 has been asserted on Bates page FBI (22-cv-3711)-391.

and modify their activities or operational security measures to thwart FBI investigative efforts. Additionally, release of this information in the context of the investigative records at issue would provide foreign adversaries with a preview of how the FBI will respond to similar investigative situations, allowing them to preemptively deploy countermeasures to disrupt FBI investigative efforts of their own, unrelated activities.

62.    Release of this type of information would also reveal key information about FBI intelligence gathering capabilities. Revealing when and why the FBI pursues or shifts investigative focuses would reveal key information about the types of investigative intelligence the FBI possessed at particular points in time, and possibly when and how such information was obtained. This could enable foreign adversaries to discover non-public details about FBI intelligence and evidence gathering methods and help them determine how they might modify their operational security to deprive the FBI of such critical intelligence and evidence.

63.    In summary, releasing the focus of specific FBI counterintelligence investigations would allow targets of these investigations to thwart FBI efforts to investigate and disrupt their activities; stunt the FBI's broader strategies for pursuing interrelated investigations; provide key information about FBI investigative strategies for pursuing counterintelligence investigations; and reveal key information about the FBI's intelligence and evidence gathering capabilities. Therefore, as release of this information would enable criminals to circumvent the law, the FBI withheld this information pursuant to Exemption 7(E).

*(b)(7)(E)-14: Non-Public Investigative Details Concerning Coordination with Other Government Agencies (OGAs)*

64.    Pursuant to Exemption category (b)(7)(E)-14, the FBI withheld non-public, investigative details pertaining to the coordination with Other Government Agencies (OGAs) in

30

the records at issue.[22] Revealing this non-public, investigative information would reveal the FBI located information on the subject matter relevant to the investigative purview of specific OGAs.[23] Release of this information in the context of these records would reveal which types of investigative information and data the FBI deems relevant enough to refer to or collaborate with certain OGAs for further investigation. Even more, disclosure of these non-public investigative details concerning investigative information sharing and coordination with OGAs could damage the viability of national security and intelligence agencies to carry out their mission. In turn, release of this information and non-public coordination would allow criminals and in particular, foreign adversaries to structure their behavior to avoid investigative triggers that would initiate an investigative referral from the FBI to its partners, and investigative scrutiny by additional government agencies. Additionally, release of this information could reveal which agencies cover specific types of investigative or intelligence matters. Repeated release of this type of information would enable criminals to predict and circumvent FBI investigative coordination with its government partners and circumvent the law enforcement purpose of these partnerships and information sharing techniques. The FBI's maintaining and strengthening of its OGA partnerships across all types of national security and criminal cases ensures the mission is advanced. Accordingly, the FBI properly asserted Exemption 7(E) to withhold this type of information.

---

[22] Exemption Coded Category (b)(7)(E)-14 has been asserted on Bates pages FBI (22-cv-3711)-5, 516, 562-563, and 581-582.

[23] The FBI's consultation process with various OGAs throughout the course of the production did not undermine the application of Exemption Coded Category (b)(7)(E)-14. The FBI meticulously analyzed its consultation process and did not consult certain non-public, investigative information pertaining to OGA coordination so as to not expose the types of information and data which may be referred to or deemed under an OGA's investigative purview.

31

## FORESEEABLE HARM STANDARD

65.     The FOIA Improvement Act of 2016 generally adopted the foreseeable harm standard and made it statutory, advising that agencies shall withhold information under the FOIA only if the agency reasonably foresees that disclosure would harm an interest protected by an exemption or disclosure is prohibited by law. Accordingly, the FBI's analysis of records responsive under the FOIA is a two-part process. First, the FBI determines whether a record or a portion of a record is exempt pursuant to one or more FOIA exemptions. Second, if the record or portion thereof is exempt pursuant to one or more FOIA exemptions, the FBI then considers whether foreseeable harm would result from disclosure of the record or portion thereof. For the withheld records and portions of withheld records at issue, the FBI conducted this two-part analysis and only withheld records or portions of records where it determined the withheld record or portion met both of these criteria. The FBI's foreseeable harm is more fully described within each of the above coded exemption justification categories.

## SEGREGABILITY

66.     As discussed in ¶ 4 *supra*, the FBI identified a total of 120 responsive pages specifically challenged by Plaintiff for this FOIA litigation: 118 Released in Part (RIP) and 2 Withheld in Full (WIF). Each of these categories is discussed below to further address segregability:

    a.   <u>Pages RIP.</u> Following its segregability review, RIDS determined 118 pages could be released in part with redactions per the identified FOIA exemptions herein. These pages comprise a mixture of material that could be segregated for release and material that was withheld as release would trigger foreseeable harm to one or more interests protected by the cited FOIA exemptions on these pages.

b. <u>Pages WIF.</u> Following its segregability review, RIDS determined 2 pages required withholding in their entirety. RIDS determined that all information on these pages was either fully covered by one or more of the cited FOIA exemptions and release of any exempt information would trigger foreseeable harm to one or more of the cited FOIA exemptions, or determined that any non-exempt information on these pages was so intertwined with exempt material, no information could be reasonably segregated for release. Any further segregation of this intertwined material would employ finite resources only to produce disjointed words, phrases, or sentences, that taken separately or together, would have minimal or no informational content.

## CONCLUSION

67.    The FBI performed adequate and reasonable searches for responsive records, processed all such records, and released all reasonably segregable non-exempt information from documents responsive to Plaintiff's FOIA request that are subject to FOIA. The FBI processed the records under the access provisions of the FOIA to achieve maximum disclosure. Information was properly withheld pursuant to FOIA Exemptions 5, 6, 7(C), and 7(E). The FBI carefully examined the documents and determined the information withheld from Plaintiff in this case, if disclosed would reveal privileged information; would cause a clearly unwarranted invasion of personal privacy, or could reasonably be expected to constitute an unwarranted invasion of personal privacy; and would disclose techniques and procedures for law enforcement investigations. After extensive review of the documents at issue, the FBI determined that there is no further non-exempt information that can be reasonably segregated and released without revealing exempt information.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A through P attached hereto are true and correct copies.

**AMIE NAPIER** Digitally signed by AMIE NAPIER Date: 2026.03.04 13:12:40 -05'00'

AMIE MARIE NAPIER
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia